UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES ALFORD WINGFIELD,

  Petitioner,

v.

Case No. 4:06-cv-130
Hon. Gordon J. Quist

LINDA METRISH,

  Respondent.

              /

**REPORT AND RECOMMENDATION**

  Petitioner, a prisoner currently incarcerated at a Michigan correctional facility, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**I.  Background**

  The Michigan Court of Appeals summarized petitioner's criminal case as follows:

> Defendant's conviction is the result of his arrest and trial for the 1982 death of Cheri Ann Edwards, after the case was reopened in 2003 by the Michigan State Police Cold Case Task Force. Edwards was fifteen years old when she was killed in July of 1982. Her body was found in a ditch along 'N' Drive West in rural Burlington Township. She lived with defendant at his establishment, the Playpen, and had a relationship with him. Testimony indicated that defendant was a pimp and had a history of violence toward women.

*People v. Wingfield*, No. 251353, slip op. at 1 (Mich. App. Feb. 15, 2005) (docket no. 22). The victim's body was discovered on July 27, 1982, by a Calhoun County employee mowing brush near N Drive. Trial Trans. I at 203-11. The record does not reflect any prosecution of the crime in 1982.

  A "cold case" task force reviewed the evidence and executed a search warrant at petitioner's residence in 2002. Trial Trans. III at 88-99. This investigation led to petitioner's arraignment on November 6, 2002. *See* State Court docket sheet (docket no. 11); Preliminary

Examination (Dec. 20, 2002) (docket no. 12). Following a jury trial, petitioner was convicted of second degree murder, M.C.L. § 750.317, and sentenced to imprisonment for a term of 30 to 50 years. *People v. Wingfield*, No. 251353.

Petitioner, through counsel, presented three issues in his direct appeal to the Michigan Court of Appeals:

> I. Is [petitioner] entitled to a new trial where the jury was not representative of the community?
>
> II. Is [petitioner] entitled to resentencing where the imposed sentence was violative of the rule of proportionality?
>
> III. Is [petitioner] entitled to a new trial where he was denied effective assistance of counsel at trial?

Brief on Appeal (docket no. 22).

The Michigan Court of Appeals affirmed the convictions. *People v. Wingfield*, No. 251353. Petitioner, through counsel, raised the same issues in his application for leave to appeal to the Michigan Supreme Court, which denied the application. *People v. Wingfield*, No. 128435, (Mich. Oct. 31, 2005) (docket no. 23).

Petitioner, through counsel, raised these three issues in the habeas petition. Petition at ¶¶ 16, 19 and 25 (docket no. 1). This matter is now before the court on the claims set forth in the petition.

### II. Standard of review under 28 U.S.C. § 2254

Petitioner seeks relief under 28 U.S.C. §2254, which provides that "a district judge shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Before petitioner may seek such relief in

federal court, however, he must first fairly present the substance of his claims to all available state courts, thereby exhausting all state remedies. *Picard v. Connor*, 404 U.S. 270, 277-78 (1981); *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994); *see* 28 U.S.C. §2254(b)(1)(A). Here, petitioner has exhausted all of the issues raised in his petition.

Where the state court has adjudicated a claim on its merits, the federal district court's habeas corpus review is limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides in pertinent part that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established Federal law if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decided the case differently than a Supreme Court decision based upon a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *Lopez v. Wilson*, 426 F.3d 339, 341 (6th Cir. 2005) (*rehearing en banc*). An unreasonable application of clearly established Federal law occurs "when the state court identified the correct legal principle from the Supreme Court but unreasonably applied the principle to the facts of the case before it." *Id.*

3

A determination of a factual issue by a state court is presumed to be correct. 28 U.S.C. § 2254(e)(1). A habeas petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence that the state court's determination was erroneous. *Magana v. Hofbauer*, 263 F.3d 542, 546-47 (6th Cir. 2001). The presumption of correctness accorded to state court's findings of fact on federal habeas review also applies to the factual findings of a state appellate court based on the state trial record. *Brumley v. Winegard*, 269 F.3d 629 (6th Cir. 2001).

### III. Petitioner's habeas claims

### A. Petitioner was denied a jury of his peers

Petitioner's counsel objected to the jury venire, based upon his belief that there were not any African American jurors "in the pool to select from or who were called -- called up to the panel." Trial Trans. I at 156. Counsel cited *Taylor v. Louisiana*, 419 U.S. 522 (1975), for the proposition that "[a] defendant in a criminal trial has a constitutional right to a jury drawn from a veneer [sic] representative of a fair cross-section of the community in which the case is tried." *Id.* The Judge rejected the challenge:

> Well let me just -- let me just say this. What came in today, the panels were panels F and G, and there are at least seven and maybe more panels that are made available to all the courts, Circuit and District every -- twice a month. And I -- I can just say from experience as the panels come in on various cases the minority representation in fact varies from panel to panel, and it just -- it just does. And I guess it's not shocking to me that that may be the case.
>
> The issue, and it seems to me the critical issue in the whole process is there needs to be or there has to be a showing that there is some type of -- that the under representation is because of some type of a systematic exclusion of the group in this jury selection process in establishing the panels. And I can -- I mean I think there is certainly not that. You have the list of -- of individuals, and they're simply broken down into the various panels, and when the lists are created, no one knows what the racial makeup of the individuals are who are assigned to each of the panels, which is probably why -- it isn't probably -- it's just -- which is why it may vary from panel to panel because they're just breaking down names.

4

So I -- I understand your -- your raising the issue, but as I said, there needs to be some showing that there is a systematic exclusion which is the reason for the under-representation as asserted here today of minority representation generally. And that hasn't been shown.

Trial Trans. I at 158-59. There is no further argument or evidence regarding this issue in the record.

The Michigan Court of Appeals addressed this issue as follows:

> Defendant argues that he is entitled to a new trial because no African-Americans were present in the jury venire. We disagree. We review questions concerning the systematic exclusion of minorities in jury venires de novo. *People v. McKinney*, 258 Mich. App 157, 161; 670 NW2d 254 (2003); *People v. Hubbard (After Remand)*, 217 Mich. App 459, 472; 552 NW2d 493 (1996).
>
> While a criminal defendant is entitled to an impartial jury that is drawn from a fair cross-section of the community, he is not entitled to a jury that mirrors the community and each of its distinctive population groups. *Id.*, citing *Taylor v. Louisiana*, 419 U.S. 522, 530; 95 S Ct 692; 42 L.Ed.2d 690 (1975). To establish a prima facie violation of the fair-cross-section requirement, a defendant must satisfy a three-prong test, showing "'(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.'" *Hubbard*, *supra* at 473, quoting *Duren v. Missouri*, 439 U.S. 357, 364; 99 S Ct 664; 58 L.Ed.2d 579 (1979).
>
> Defendant has satisfied the first prong of the *Duren* test, because "African-Americans are considered a constitutionally cognizable group for Sixth Amendment fair-cross-section purposes." *Hubbard*, *supra* at 473.
>
> Defendant argues that the second prong is satisfied because African-Americans were substantially underrepresented in the jury pool. "Merely showing one case of alleged underrepresentation does not rise to a 'general' underrepresentation that is required for establishing a prima facie case." *People v. Howard*, 226 Mich.App 528, 533; 575 NW2d 16 (1997). Defendant presents no evidence of underrepresentation on a broader scale, or in general, with respect to Calhoun County jury venires, and, hence, has not met his burden on this prong of the *Duren* test. *Id.*
>
> Likewise, defendant has not satisfied the third prong of the *Duren* test, which requires him to show that systematic exclusion caused the underrepresentation.

5

> *People v. Williams*, 241 Mich.App 519, 526; 616 NW2d 710 (2000). Defendant argues that selecting names from lists satisfies this prong because the trial court did not indicate that it was random, but he offers no evidence showing the systematic exclusion of African-Americans from Calhoun County jury venires. Defendant argues that systematic exclusion is a recurring problem, but provides no evidentiary support. Defendant fails to show that a problem inherent in the selection process resulted in systematic exclusion. *Id.* at 527. Defendant fails to carry his burden and is not entitled to a new trial.

*People v. Wingfield*, No. 251353, slip. op. at 1-2.

The Michigan Court of Appeals properly analyzed this issue under the *Duren* test. The Sixth Amendment guarantees a criminal defendant an impartial jury drawn from a fair cross-section of the community. *Duren*, 439 U.S. at 358-59; *Taylor*, 419 U.S. at 526-31. The petit jury does not have to mirror the community, but distinct groups cannot be systematically excluded from the venire. *See United States v. Jackman,* 46 F.3d 1240, 1244 (2nd Cir. 1995). While petitioner met the first prong of the *Duren* test by showing that African Americans are a cognizable distinctive group, he failed to meet the second and third prongs. With respect to the second prong of the *Duren* test, petitioner merely made the conclusory statement that "the group was underrepresented in the jury pool." Petitioner's Brief at 11 (docket no. 22). He presented no evidence that the representation of this group in the venires was not fair and reasonable in relation to the number of African Americans in the community. With respect to the third requirement, petitioner asserted that the jury selection, as described by the trial judge, was not "random" and that "this selection, which is a recurring problem, systematically excluded the group from the selection process, requiring reversal." *Id.* Petitioner, however, presented no evidence that this alleged underrepresentation was due to systematic exclusion of the group in the jury-selection process.

This court cannot find a Sixth Amendment violation based upon these conclusory statements. "Absent evidence of the percentage of African-Americans in the community, we have

no baseline against which to compare the composition of Defendant's venire." *United States v. Williams*, 264 F.3d 561, 568-69 (5th Cir. 2001), citing *Duren*, 439 U.S. at 364 ("[T]he defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement."). *See, e.g., United States v. McCaskill,* 48 Fed. Appx. 961, 962 (6th Cir. 2002) (defendant's conclusory assertions are insufficient to establish a prima facie violation of the Sixth Amendment's fair cross-section requirement); *United States v. Davis*, 27 Fed. Appx. 592, 597-98 (6th Cir. 2001) (court determined that the defendant's failure to meet his evidentiary burden by presenting "the statistical evidence or factual background" necessary to challenge the racial make-up of a jury panel "dooms his claim" that the jury was not picked from a fair cross-section of the community under *Duren*); *Lassiter v. Jones,* No. 00-cv-73869, 2002 WL 1480812 at *7 (E.D. Mich. June 26, 2002) (where "there was no evidence in the trial record which could establish that the absence of potential black jurors was unfairly and unreasonably unrepresentative of the composition of the community or that their absence was the result of a systematic exclusion of blacks from the jury selection process," court found that habeas petitioner's Sixth Amendment claim for denial of an impartial jury amounted "to only a conclusory allegation for which we can grant no relief").

The state court's decision was neither contrary to, nor an unreasonable application of, clearly established Federal law as determined by the Supreme Court; nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254 (d). Accordingly, petitioner is not entitled to relief on this claim.

### B. Proportionality of the sentence

Next, petitioner contends that he is entitled to a resentencing because his sentence of 30 to 50 years violates the rule of proportionality. Petitioner contends that: the alleged crime took place in 1982; there were no Michigan sentencing guidelines in effect in 1982; and that the trial judge imposed a sentence that exceeded the guidelines in effect when petitioner was sentenced in 2003.

Petitioner's claim does not raise a federal constitutional issue cognizable under § 2254. Federal habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Federal habeas corpus relief does not lie for errors of state law, which includes the state's computation of petitioner's prison term. *See Kipen v. Renico*, No. 02-1742, 2003 WL 21130033 at *1 (6th Cir. May 14, 2003), citing *Estelle*, 502 U.S. at 68. *See also Austin v. Jackson,* 213 F.3d 298, 300 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief). "As long as the sentence remains within the statutory limits, trial courts have historically been given wide discretion in determining 'the type and extent of punishment for convicted defendants.'" *Austin*, 213 F.3d at 301, *quoting Williams v. New York*, 337 U.S. 241, 245 (1949). In this case, petitioner's sentence of 30 to 50 years for second degree murder fell within the statutory limits. *See* M.C.L. § 750.317 (second degree murder "shall be punished by imprisonment in the state prison for life, or any term of years, in the discretion of the court").

Finally, to the extent that petitioner contends that his sentence violates the "doctrine of proportionality," this claim also fails. "Federal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of

parole." *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Because petitioner's sentence was neither a death penalty nor life in prison without possibility of parole, he is not entitled to federal habeas relief on this proportionality claim. For these reasons, this claim is denied as not cognizable on federal habeas review.

## C. Ineffective assistance of counsel

Wingfield contends that his trial counsel was ineffective for failing to hire a private investigator, despite having been granted funds for that purpose. Petition at ¶¶ 25-27. Petitioner contends that he was prejudiced because "the addresses of witnesses who had moved during the nineteen years [since the murder] could have been obtained, but were not," and that "he was not able to pursue any inconsistencies in witness statements." *Id.* at ¶¶ 28-29.[1]

The Michigan Court of Appeals addressed this issue as follows:

> Defendant's final argument is that he was denied effective assistance of counsel because defense counsel failed to (1) hire an investigator, (2) notify the prosecutor of proposed defense witnesses, and (3) request assistance from the prosecutor in locating witnesses. We disagree. Because there was no evidentiary hearing or motion for a new trial before the trial court, our review is limited to mistakes apparent on the record. *People v. Williams*, 223 Mich.App 409, 414; 566 NW2d 649 (1997).
>
> The determination whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law that are reviewed, respectively, for clear error and de novo. *People v. LeBlanc*, 465 Mich. 575, 579; 640 NW2d 246 (2002). In *People v. Carbin*, 463 Mich. 590, 599-600; 623 NW2d 884 (2001), our Supreme Court outlined the basic principles behind a claim of ineffective assistance of counsel:
>
>> To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v.*

---

[1] The habeas petition did not seek relief for the two other claims of ineffective assistance of counsel raised by petitioner in his state court appeal (i.e., defense counsel failed to notify the prosecutor of proposed defense witnesses or request assistance from the prosecutor in locating witnesses).

9

*Washington*, 466 U.S. 668; 104 S Ct 2052; 80 L.Ed.2d 674 (1984). *See People v. Pickens*, 446 Mich. 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, *supra* at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. *See People v. Hoag*, 460 Mich. 1, 6; 594 NW2d 57 (1999).

Defendant argues that defense counsel was ineffective because he failed to hire a private investigator to locate witnesses, which resulted in the failure to call witnesses whose testimony would have created a great probability of a different outcome. On June 9, 2003, defense counsel requested an adjournment because he needed more time to hire a private investigator. The trial court denied the motion because funds for an investigator had been granted almost three weeks earlier. Defendant contends that competent counsel would have hired an investigator and pursued potential witnesses. Defendant also contends that certain witnesses should have been located: Evelyn Porter, to confirm or deny Barbara Riley's testimony that defendant admitted to killing Edwards; Diane Lopez; and a woman known only as Jeanette, with whom defendant claims he spent the night of July 24, 1982. Defendant also argues that defense counsel failed to notify the prosecutor of the defense witnesses he wished to call at trial.

This Court will neither substitute its judgment for that of defense counsel regarding trial strategy matters, nor will it evaluate counsel's competence with the benefit of hindsight. *People v. Matuszak*, 263 Mich.App 42, 58; 687 NW2d 342 (2004). However, the mere fact of a decision being one of strategy does not insulate defense counsel's actions from scrutiny. A defendant "must overcome the presumption that a challenged action might be considered sound trial strategy." *People v. Tommolino*, 187 Mich.App 14, 17; 466 NW2d 315 (1991). A reviewing court should inspect the challenged action to determine whether it was a sound strategic decision. *See id.* at 17-19.

> Even if defense counsel's failure to hire an investigator was deficient, we are not convinced that this failure was outcome determinative. Porter's testimony could have been helpful or hurtful, and that of Davis and Jeanette about defendant's whereabouts has little bearing, given the testimony of six witnesses that saw defendant with Edwards on July 25 or 26, 1982. Defendant does not indicate how other witnesses would have testified at trial and has not overcome the presumption of effective assistance of counsel. Defendant's argument is much too speculative.
>
> Further, the failure to hire an investigator is inextricably intertwined with the failure to call witnesses. The decision to call witnesses is presumed to be a matter of trial strategy. *People v. Dixon*, 263 Mich.App 393, 398; 688 NW2d 308 (2004). The failure to call witnesses or present other evidence constitutes ineffective assistance if it deprives the defendant of a substantial defense, which might have made a difference in the outcome of trial. *Id.* Because defendant fails to indicate the substance of the potential testimony of these witnesses, we cannot conclude that it would have been outcome determinative. Prejudice has not been established.
>
> Defendant also argues that defense counsel failed to request the prosecution's assistance in locating the witnesses lacking contact information, as provided for by MCL 767.40a(5). Defendant contends that had such assistance been obtained, many witnesses could have been located, and a more comprehensive investigation than that performed by the prosecution would have located more witnesses. Defendant has mischaracterized the prosecution's efforts in locating his witnesses. The prosecutor indicated that his investigators had located two witnesses and detailed efforts made to locate others. We fail to see how the prosecution's efforts would have differed had defense counsel requested assistance; therefore, this argument fails. Based on the record, defendant has not overcome the presumption of effective assistance of counsel and fails to establish prejudice.

*People v. Wingfield*, No. 251353, slip. op. at 4-6.

In *Strickland,* 466 U.S. at 687, the Supreme Court set forth a two-prong test to determine whether counsel's assistance was so defective as to require reversal of a conviction: (1) the defendant must show that counsel's performance was deficient and (2) the defendant must show that counsel's deficient performance prejudiced the defense, i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." In making this determination, the court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690.

11

"[T]he threshold issue is not whether [petitioner's] attorney was inadequate; rather, it is whether he was so *manifestly* ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (emphasis in original). Under *Strickland*, the reviewing court's scrutiny of counsel's performance is highly deferential, and the court is to presume that counsel rendered adequate assistance and made decisions with reasonable professional judgment. *Strickland*, 466 U.S. at 689-690.

In evaluating counsel's performance, the court should be mindful that "[t]he Constitution does not guarantee every defendant a successful defense," nor does it guarantee the accused "an excellent lawyer." *Moran v. Triplett*, No. 96-2174, 1998 WL 382698 at *3, *5 (6th Cir. 1998). Rather, "[t]he Sixth Amendment entitles criminal defendants to effective assistance of counsel which means the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *United States v. Boone*, 437 F.3d 829, 839 (8th Cir. 2006) (internal quotes omitted).

"Under *Strickland*, trial counsel has a duty to investigate his case." *Stewart v. Wolfenbarger*, 468 F.3d 338, 356 (6th Cir.2006). This duty includes an obligation to investigate all witnesses who may have information concerning the client's guilt or innocence. *Id.*

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. Thus, the question for the court is whether "reasonable professional judgments support the limitations on investigation." *Avery v. Prelesnik*, 548 F.3d 434, 437 (6th Cir. 2008), quoting *Strickland*, 466 U.S. at 691.

Here, petitioner's counsel faced the substantial challenge of locating witnesses approximately 20 years after the victim's murder. The trial court entered an order allowing funds for a private investigator on May 20, 2003. State Court docket sheet (docket no. 11); Motion Hearing 6/9/03 at 7,10 (docket no. 7). Petitioner's counsel sought to adjourn the trial on June 9, 2003, because he was still trying to locate an investigator. *Id.* The judge observed that he may have ruled on the request for an investigator on April 28, 2003 and entered the order the next month. *Id.* at 10. At the hearing, counsel relied on the reasons as set forth in the motion, stating that "I'm still trying to locate a private investigator." *Id.* at 7. The judge denied the motion to adjourn the trial, setting it for June 17, 2003. *Id.* at 10. The Michigan Court of Appeals bypassed the decision of whether counsel acted deficiently and proceeded to the "prejudice prong" of the *Strickland* test.

Petitioner cited no authority in either the state appellate court or in this court, for the proposition that Counsel's delay in securing an investigator between the time the court ordered funds for an investigator (May 20, 2003) and the motion to adjourn (June 9, 2003) constituted deficient performance. Petitioner has offered no evidence to explain why counsel was unable to secure an investigator. While those reasons may have been set forth in counsel's motion to adjourn, this court does not have a copy of that motion. Based on this record, there is no basis to find that counsel was deficient solely because he was unable to secure a private investigator prior to the June 9, 2003 motion hearing.

Moreover, even if the court concluded that counsel had been deficient in failing to hire an investigator during that time period, the court must agree with the Michigan Court of Appeals that petitioner was not prejudiced by this action. Petitioner identifies only three witnesses who might have aided his case: Evelyn Porter; Diane Lopez; and a woman named "Janette."[2] Petitioner's Brief on Appeal at 16.

### 1. Diane Lopez and Janette

Petitioner has offered no argument with respect to the potential testimony of either Diane Lopez or the woman named "Janette." Petitioner testified that he last saw the victim on Saturday, July 24, 1982. Trial Trans. V at 44. He was in the company of Lopez and Janette from the night of July 24th until 3:00 or 4:00 a.m. on July 25th. *Id.* at 44-46. Petitioner testified that the victim never came back to the Playpen and that he first heard about the victim's death the next week. *Id.* at 46-47. As the state appellate court observed, however, even if Lopez or Janette corroborated petitioner's whereabouts on the evening of July 24th through the early morning hours of July 25th, such testimony would have had little bearing on the outcome of the trial in light of testimony from six witnesses that placed petitioner with the victim on July 25th, 26th and 27th.

Willie Davis testified that he saw petitioner arguing with the victim in the parking lot of a convenience store on the night of Sunday, July 25, 1982, at approximately 9:00 p.m. or perhaps as late as 10:30 p.m. Trial Trans. II at 46-53. Louise Fitzpatrick had a relationship with petitioner and he was the father of her daughter. Trial Trans. II at 116. About two and one-half months earlier, petitioner had placed his hands around Fitzpatrick's throat after she told petitioner that she wanted to go home to her family. *Id.* at 117-18. A few days later, when Fitzpatrick told

---

[2] It appears that the Michigan Court of Appeals referred to this woman as "Jeanette."

14

petitioner that she wanted to go home, petitioner put his hands around her throat a second time and told Fitzpatrick that her family did not love her. *Id.* at 119-21. When Fitzpatrick tried to contact her family a third time, petitioner choked her and she passed out. *Id.* at 122-24. At this time, Fitzpatrick feared for her life. *Id.* at 124-25. Fitzpatrick testified that she and petitioner's sister met with petitioner and the deceased victim, Cheri Edwards, on the night of Monday, July 26, 1982, to tell Edwards to go home to her mother and "because if she didn't she was going to end up gettin' killed." *Id.* at 113-15, 125-27. Petitioner interrupted the conversation and told Edwards to stop listening to Fitzpatrick. *Id.* at 126-27.

In the early afternoon of Monday, July 26th, Robert Straham talked with Cheri Edwards at the Input Bar and told her to call home and check in with her parents. Trial Trans. II at 61-65. Straham thought that he saw petitioner in the car with the victim at that time. *Id.* at 65. Stanley Wilson, a longtime friend of Cheri Edwards, saw her with petitioner at about 8:00 p.m. on Monday, July 26th near a club called the Speak Easy. *Id.* at 71-89. Steve Martin testified that sometime after midnight on Monday, July 26th, he saw petitioner and Cheri Edwards arguing in a car. *Id.* at 198-203. Rosemary Williams[3] testified that sometime after midnight on July 26th and the early morning hours of July 27th, she was at the Playpen (which was located at the northwest corner of the Hart Hotel). Trial Trans. III at 112-13. Petitioner and Cheri Edwards were arguing. *Id.* at 113-14. At some point, petitioner hit her twice in the head with a pool stick and then they

---

[3] Because Ms. Williams was unavailable to testify in person, her preliminary examination testimony was read to the jury.

went down into the basement. *Id.* at 114-16. While they were in the basement, Williams' heard Cheri Edwards say "somebody help me." *Id.* at 116.[4]

### 2. Evelyn Porter

By way of background, Barbara Riley testified that she knew both petitioner and the victim. Trial Trans. IV at 83-91. In the early 1980's, defendant told Riley that he had a whorehouse. *Id.* at 86. Riley described petitioner's "business occupation" as a pimp. *Id.* Sometime in 1984, Riley asked petitioner if he killed the victim, and he said "yes." *Id.* at 88-89. When asked why he did it, petitioner said the victim did not make him money. *Id.* at 90-91. Riley did not tell the police because she did not want to get involved. *Id.* at 90. Riley testified that Evelyn Porter was present during this conversation. *Id.* at 91, 96-97. With respect to Evelyn Porter, petitioner asserts that "[a]t the very least, Ms. Porter, to whom Ms. Riley claimed to have told what [petitioner] had said, should have been sought out either to confirm or contradict that testimony." Brief on Appeal at p. 16. Petitioner testified that the conversation with Riley never occurred. Trial Trans. V at 54. The court agrees with the Michigan Court of Appeals determination that Evelyn Porter's testimony could have been either helpful (by corroborating petitioner's testimony) or hurtful

---

[4]The court notes that petitioner had contact with another witness that night, Peggy Fields, a woman who knew both petitioner and the victim. Trial Trans. IV at 8-11. Petitioner stopped by Ms. Field's house on the evening of July 26th (Ms. Fields recalled that the sun was going down). *Id.* at 8-9. Petitioner walked on to the porch and spoke with Ms. Fields, telling her that he was going down the street. *Id.* at 14-15. He was headed in the direction of the Hart Hotel. *Id.* Petitioner returned to the house sometime later, at about 2:00 or 2:30 a.m. on July 27th. *Id.* at 16. Ms. Fields was watching television when petitioner knocked at the door. *Id.* at 16-17. Petitioner appeared scared and sweating, with his eyes about "as big as a fifty-cent piece." *Id.* at 17-18. When Ms. Fields asked him was wrong, petitioner said, "Baby girl, I done somethin' I had no business doin.'" *Id.* at 18. He sat in a chair and put his face in his hands and then left abruptly. *Id.* at 19. Ms. Fields saw petitioner about one year later. *Id.* at 20. When she asked him "Did you kill that girl," petitioner left without answering the question. *Id.* Ms. Fields did not see petitioner again until about 19 years later, when she testified at his preliminary examination in 2002. *Id.* at 21.

16

(by corroborating Ms. Riley's testimony). To this date, petitioner has presented no evidence regarding the location of Ms. Porter or her potential testimony on this issue.

Ms. Riley's testimony, however, was not unique. Petitioner made an earlier admission to Jamie Lynn Lane shortly after he committed the murder. Ms. Lane worked at her parents' bar in 1982. Trial Trans. II at 214. She had been raped by a pimp named Fred Hamilton. *Id.* at 214-16. On or about August 1, 1982, petitioner came into the bar and said the word on the street was that the pimp ("Freddie") was going to have Ms. Lane in his pen as a prostitute. *Id.* at 217. Ms. Lane became scared and said she was going to tell her parents. *Id.* Petitioner told Ms. Lane not to tell her parents, explaining "that he could take care of it because he had killed somebody before, Cheri Edwards, and he had gotten away with it, and that he could kill Freddie, and nobody would know what had happened to me." *Id.* at 218. This second admission by petitioner would lessen the impact of any favorable testimony by Ms. Porter.

Based on this record, petitioner has failed to demonstrate any prejudice that resulted from his counsel's failure to hire the investigator before June 9, 2003. The prosecution presented substantial evidence to contradict petitioner's testimony that he last saw the victim on July 25, 1982. In addition, even if Ms. Porter had been located and testified in petitioner's favor, it would not have been outcome determinative in light of the totality of the other evidence presented to the jury.

The state court's decision was neither contrary to, nor an unreasonable application of, clearly established Federal law as determined by the Supreme Court; nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254 (d). Accordingly, petitioner is not entitled to relief on this claim.

## V.     Recommendation

I respectfully recommend that petitioner's habeas petition be **DENIED**. Rule 8, Rules Governing § 2254 Cases in the United States District Courts.


Dated:  November 30, 2009                    /s/ Hugh W. Brenneman, Jr.
                                             HUGH W. BRENNEMAN, JR.
                                             United States Magistrate Judge



ANY OBJECTIONS to this Amended Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).